### IN PROBATE —JULY, 1856.

## IN THE MATTER OF THE ESTATE OF A. F. TURNER, Deceased.

An administrator is to be regarded in the light of a trustee, and if he becomes a purchaser of the intestate's property, the heir at law may come into court within a reasonable time, and have the sale to the administrator set aside, and the property re-exposed to sale; and where the administrator has re-sold the property purchased by him, at a profit, he may be held to account to the heir at law for a share of that profit, being allowed to set off any pre-existing incumbrance paid by him, and the cost of permanent improvements made by him, in the mean time.

The court refused to allow the administrator commissions on the sale of real estate, where it appeared that it was not necessary to sell the same, for the payment of debts; and held him responsible for interest on the funds in his hands from the time he was ordered to account by the court.

JUDGE ROBERTSON delivered his decision as follows:

The settlement of this estate belongs properly to the circuit court of Kauai, but for the convenience of the parties interested, and at their request, I have consented to act for Judge Hardy in the premises.

It appears that, at the time of his decease, Mr. Turner was jointly interested with Mr. John Montgomery of Honolulu, in a dairy farm on the Island of Kauai, which Mr. Turner as managing partner conducted on their joint account. Shortly after Mr. Turner's death, his surviving partner, Mr. Montgomery, applied for and obtained letters of administration on his estate from Judge Bond of Kauai; proceeded to dispose of a portion of the personal property of the partnership —and all the personal effects of Mr. Turner; and paid off the debts of the firm and the private debts of Mr. Turner. On the 20th of May, 1854, the administrator obtained from Judge Bond an order to sell the undivided interest of Mr. Turner in the Wailua Falls Estate. After public notice, the whole estate including the cattle, was sold at auction, and bid off by Mr. Duncan McBride at $2,500, which sale was approved by Judge Bond on the 11th of August following. It is now alleged on behalf of the heirs at law, and admitted by the administrator, that Mr. McBride did not bid off the estate for himself, but purchased it for Mr. Montgomery, who resold it to Mr. Hoffschlaeger, in September 1854, for $5,950; and the heirs at law ask that Mr. Montgomery be made to account, as administrator, for one half the proceeds arising from the second sale. It is also claimed on behalf of the heirs at law that Mr. Montgomery is not entitled to any commissions on the proceeds of the real estate, and that he is chargeable with interest on any funds belonging to the estate of Mr. Turner, appearing to have been in his hands from the time he was required by Judge Hardy to account as administrator.

I deem it unnecessary to rehearse all the points raised by the respective counsel at the hearing, and will proceed to consider the main point made for the heirs at law, in regard to the profits arising from the re-sale of the estate. It is contended on the part of the administrator that the first sale was a fair one; that public notice was previously given in the usual way, and every opportunity afforded to parties desirous of bidding; that no fraud or unfair dealing is alleged

by the heirs at law, and that the sale having been confirmed by the court, cannot now be disturbed.

It is true that the sale was confirmed by the court, but it was reported by the administrator as a sale to Mr. McBride, and not to himself, as it is now admitted to have been; and to hold that the sale could not be disturbed on that account, would be to allow the administrator to gain an advantage under the the confirmation of the court, based upon a mis-representation of the actual facts in the case. But independent of this consideration, I do not think the confirmation of the sale by the court of much weight, so far as the interests and rights of the heirs at law are concerned, inasmuch as they were at that time un-represented here, except by the administrator himself. It cannot be said that those heirs have ever acquiesced in or ratified the sale up to this day, although they are now willing to let it stand on condition of their being allowed to share in the profits of the re-sale. It is not contended on the part of the administrator that it was necessary to sell the real estate, in order to raise funds to pay off either the partnership debts or the private debts of Mr. Turner; in fact it appears that the proceeds of the furniture, horses and other effects, were more than sufficient for that purpose.

But, apart from any consideration as to the fairness of the sale, or its necessity, it is contended by the heirs at law, that Mr. Montgomery could not, under any circumstances, be allowed, whether he is to be regarded as administrator or surviving partner, to become personally interested in the purchase of the estate, of which he was a trustee for sale. I am clearly of opinion that this positoin is a sound one, and that it is sustained by the great weight of both English and American authorities. The administrator is to be regarded in the light of a trustee for all the parties interested, and as such he could not be permitted, while selling property for the benefit of others, to become himself the purchaser. I do not say that where the administrator becomes interested in the purchase, this renders the sale absolutely null and void, but that in every such case the *cestui qui trust*, may, unless he has subsequently, with full knowledge of the facts, acquiesced in such sale, come into court within a reasonable time, and ask that it be set aside, and the property re-exposed to sale, under the direction of the court. If a trustee will purchase, he does so subject to this equity of the *cestui qui trust.*

In the case of Davone *vs.* Fanning *et als.*, cited by the learned counsel for the heirs at law, this doctrine was broadly asserted by Chancellor Kent, after a careful review of many adjudged cases. In that case the executor did not purchase for himself, but procured a third party to purchase the property in trust for his wife, and executed a deed accordingly. He subsequently erected buildings on the land, and mortgaged it to raise money for that purpose. The Chancellor decreed that the sale should be set aside and the property, with the improvements thereon, re-exposed to public sale, subject to the mortgage. See Davone *vs.* Fanning *et als*, 2 John. Ch. Rep. 251, and cases therein referred to.) I am aware that dicta are to be found in the books, which may be understood as relaxing the doctrine here asserted, but the highest names which have ever adorned the equity bench concur in the propriety and wisdom of adhering strictly to the rule, that a trustee shall not unite in himself the character both of

seller and buyer. The rule which strikes at the root of the evil, has its foundation in sound policy, and is calculated to guard against the hazard of abuse, by removing the trustee from the temptation to make a gain to himself from his fiduciary capacity. The question in any case is not whether the sale was public or private; whether the property has realized a fair price, or whether any fraud is charged against the trustee. He cannot protect himself from the operation of the rule, as is attempted in the present case, by saying he gave as good a price for the property as could be got from any one else. The *cestui qui trust* may say, in all cases, that he will try whether the property will sell to better advantage; and he has a right to whatever profit the trustee has made by the purchase.

This is a peculiar case, and demands the strictest scrutiny. Mr. Montgomery was doubly clothed with a fiduciary character, being at once the surviving partner and administrator of Mr. Turner. His position in sustaining, in his own person, these diverse characters, while the heirs at law of Mr. Turner reside in a foreign land, was peculiarly calculated to touch and awaken the suggestions of self interest, unconsciously, it might be, to himself. Under these circumstances he became the purchaser of the property, through the intervention of a third party. No case ever came more fairly within the reason of the rule than the present, and it must be dealt with accordingly.

It is argued on the part of the administrator that the court cannot now interfere in the matter, because the sale to Mr. Montgomery cannot be set aside, and a re-sale of the property ordered, without disturbing the rights of third parties, and that this is the only relief which the court can give in any case. I am clearly of opinion that this argument cannot be sustained, either upon principle or authority. It is in the power of the court to suit the relief to the exigencies and circumstances of the case, and that can be best accomplished in the present instance, by requiring the administrator to account for a share of the profits arising from the sale to Mr. Hoffschlaeger. In this way substantial justice may be done between Mr. Montgomery, and the heirs at law, without disturbing the rights of other parties. Such was the mode of giving relief adopted in the case of Fox *vs.* Mackreth, 2 Bro. C. C. 400; and in the case of Randall *vs.* Errington, 10 Vesey's Rep. 423. In the latter case, Sir Wm. Grant, M. R., although the sale was fair at auction, and the purchase by the trustee for a full price, opened the sale at the request of the *cestui qui trust,* as to such parts of the property as had not been re-sold by the trustee, and held him to account for the profit made on the part he had sold; and this after the lapse of a number of years.

It is claimed on the part of the administrator, that if he is held liable to account for a share of the proceeds of the second sale, he ought to be allowed the amount of a pre-existing mortgage on the estate, paid off by him between the time of the first and second sales, and also for certain improvements made during the same time, calculated to enhance the value of the estate. I think he is justly entitled to this allowance, and an opportunity must be afforded him of showing what amount he is thus entitled to off set.

The next question is as to whether or not Mr. Montgomery ought to be allowed commissions on the sale of the real estate. It is con-

tended on the part of the heirs at law, that he ought not to receive any such commissions, on the ground that the sale was not necessary to raise funds for the payment of debts. The counsel for the administrator says he submits the question of commissions entirely to the discretion of the court, but argues that Mr. Montgomery had a right, as surviving partner, to dispose of the partnership property, and that it was necessary to do so in order to wind up the business. My opinion is, that if Mr. Montgomery had disposed of the estate, as surviving partner, he would not be entitled to any commissions as it is a duty incumbent upon every surviving partner to settle up the partnership business, and account faithfully with the representatives of the deceased. In this case had the partnership business been wound up in that way, and the estate of Mr. Turner been administered upon by the public administrator, there would have been no commissions to pay upon the sale of the real estate, and I do not think Mr. Montgomery is justly entitled to claim any. He did not in fact receive any money, in his character of administrator, either from the first or second sale.

Finally, it is claimed by counsel for the heirs at law, that the administrator should be charged with interest on the funds in his hands, after the 7th of November last, at which date he was ordered by Judge Hardy to account. It is admitted by the administrator that he is chargeable with interest, from the time that there was any person within the kingdom authorized to receive the balance belonging to the heirs at law.

I think there is no doubt that, in every case where an administrator having surplus funds in his hands, has mixed up those funds with his own, so as to derive therefrom an increased amount of credit, or has used them in any way so as to gain interest thereon, he is chargeable with interest in favor of the estate; and where it does not appear that the money has been kept separate from that of the administrator, ready to be paid over when called for, it is fair to presume that he has made use of it, and the rule applies that he ought not to derive any advantage to himself from the trust property. (See Haslar vs. Haslar, 1 Bradford's Rep. 252; Ogilvie vs. Ogilvie, ib. 358; Rocke vs. Hart, 11 Vesey's Rep., 59.) In the present case, it appears that the administrator has had a considerable balance in his hands ever since the sale of the estate to Mr. Hoffschlaeger, and even before that time, and I do not see any great force in the argument that, because no one here was at that time authorized to represent the heirs at law, he cannot be charged with interest. If the administrator wished to relieve himself from the responsibility for interest, he might at any time have paid the funds into court. I think the great question is, has he used the funds himself? If so, he must be charged with interest, and the *onus* is upon the administrator to show that he has not done so. I think he is liable, beyond a question, for interest from the 7th of November at least. The decision in each case must depend, in some measure, upon its own peculiar circumstances, and in this case I think the administrator may fairly be called upon to pay interest from the date indicated above, upon any balance then appearing to have been in his hands.

Mr. Harris and Mr. Marsh for the administrator.

Mr. Ducorron for the heirs at law.